Okay, before your clock starts and before you start arguing, just so it doesn't come as some surprise to you when you learn it, if you learned it later on, I know Mr. Lewis. His father-in-law is a lawyer of some prominence in Phoenix, and we've known each other for some time, although I wouldn't describe him as a frequent social friend. I know him and know others, so. Well, as long as you give me a fair shake, that's all I ask. Absolutely positively. That's fine, Your Honor. Okay. Mr. Lewis said don't bend over backwards the other way. That would be okay. I always worry about people finding this stuff out later and wondering why they weren't told. Thank you. You go right ahead. Thank you, sir. I appreciate it. My name is David Abney. I represent the plaintiff appellant, Andrew Werft. It's a wonderful case to take up on appeal. There's some great issues. I don't know what's troubling you offhand. I appreciate your inviting us to your courthouse. It's a beautiful place. One of the issues that came up at me last night when I was going over the response brief was the defense argument that we're not allowed to get into what corrective action the church is supposed to have taken, ameliorative action,  But the Bouldard case starts out with the discussion that Mr. Bouldard was seeking damages for the lack of corrective action, saying that his reports prompted no corrective action. And then the opinion ends up with the discussion of the fact that the jury has to make certain secular judgments about the nature and severity of the harassment and what measures, if any, were taken by the Jesuits to prevent or correct the situation. Well, here's the problem. The basic, whether one likes the ministerial exemption or not, the basic point of the exemption is we don't go fossicking about in churches' decisions about how they want their workers working, basically. Now, in Bouldard, it was pretty well accepted, and it would have been pretty hard for anybody to argue differently, that being sexually assaulted was not part of the work job. That wasn't part of the job. So it's like if they took him outside and beat him with their fists, that wasn't part of the job, and he probably could have sued for battery. Here we're talking about, by definition, I think, what we call accommodation. Accommodation, if I understand, accommodation goes right to the heart of what an employer wants an employee to do, because accommodation means I can't, I'm not able to do it the way you want it done. I want you to accommodate me and let it be done differently. Whether that means I have an assistant or whether that means I get to do something else, we don't have to go there. But the point of accommodation is you have to accommodate me and change the way you would rather see it done to accommodate me so that I can do it my way, slightly differently. I'll accomplish the same thing, not to worry. I don't see why that doesn't go right to the heart of the ministerial exemption. I thought that's what the exemption was about. I don't think so. Okay. I think the ministerial exemption under Bullard is always spoken of in the context of hiring and firing, the amount of money you're going to pay the minister, the place, the destination where the minister is going to be. Take a close look at the opinion. Every time they talk about conditions of employment, the preceding sentence or the preceding phrase deals with hiring and firing and fundamental choices that really cannot be extricated from religion. Now, they may fire somebody. So if I wouldn't hire you because you tell me you want your ministers to work 15 hours a day and I have X conditions so I can't work 15 hours, I can only work 13 hours a day, but listen, I'm so good in 13 that I'm as good as anybody at 15 and I won't hire you because I don't want my ministers behaving that way. That's okay. That is okay. But if I do hire you to do 15 and then you come on and you say, whoops, I've just decided I can only do 13, then the ministerial exemption doesn't protect me. Is that what you're saying? Until you fire me. Gotcha. I've got your argument. So basically your argument is that the church had a perfect right to say, we aren't going to hire anybody that has the symptoms that your client has. We're not going to hire anybody with dyslexia. We're not going to hire anybody with heart problems. We're not going to hire anybody with ADD. Correct. And that's covered. Absolutely. And the reason is, I mean, that may be the reason why they're refusing to hire you. It may be the reason why they fire you. But you can't, once you start saying, well, why did you hire this person, you immediately get into the realm of religion. Well, we hired this person because he was a charismatic preacher. I mean, you have to dig and dig and dig to find out the underlying improper reason why they did it. And I think that's why the ministerial exception applies as a blanket rule to hiring and firing. All right. So you're saying, okay, taking your client's symptoms, you say they're straight out and say we're not hiring your client because of these. What if they say we're firing your client because of all of this? It's the same thing. I mean, I wish I could change that. I really do. But that's not our case, of course. No, it's not your case in a sense, but it's a constructive discharge case in perhaps another sense. Our case isn't a constructive discharge case either. It started out sort of that way, and I say constructive discharge and damages for the period of time when you're not providing reasonable accommodations. And then I get smacked in the face by this ministerial exception, which I had never heard of. And when I looked at it, there's no court in the nation other than Ninth Circuit that I could figure out that has tackled this head on and said, look, okay, hiring and firing we're not going to touch. And I think the reason why, quite frankly, is that you can come up with any religious reason you want for hiring and firing. So why open that can of worms? Because you're really tromping right into the middle of the First Amendment. Bothered's a little bit different, though, isn't it? I mean, that was not in any way in the employment context, was it? Bothered wanted to stay inside the Jesuit ministry, didn't he? Well, yes, he did. And Mr. Work wanted to stay. He's saying I want to stay. I want to make this my life. I just want to be free of this particular activity. Exactly right. That's the point. He wanted to stay in it, but he was forced out. It was a constructive discharge. It wasn't for sexual assault, by the way. It was for sexual harassment. He's sexually harassed. It was a sexually harassing environment at work. And what I've got now is an environment at work with no reasonable accommodation, not even minor rescheduling was done for Mr. Work. And even though he wanted to continue on with his ministry in the Methodist Church, it got so bad that he was forced out. He took a retirement because there was no other way for him to deal with the situation. His health was disintegrating. The thing is nobody can conceive of a church where sexual harassment and sexual assault, leading perhaps to sexual assault, which I think is what he was complaining about, that's where it was going, if it didn't get there. It didn't. Nobody can conceive of a church where that would be part of the religion or could conceivably be connected. Like it would be hard to conceive of a church where people are taken out and beaten every day, although we know that has occurred. In Iraq, if you want to go to the Shia assembly of the last month, they beat themselves. I ain't going to Iraq. Okay. Or if you want to go to certain satanic mosques. Not going there. Let's stay in the bad enough universe that we have to live in. Yes, sir. Okay. Nobody can conceive of a church where that has anything to do conceivably with being a priest, i.e., you must be sexually harassed and or assaulted. Nobody can conceive of that. It's pretty easy to conceive of a church that says, listen, we can't deal with having people who can't give us the full shot. Whatever we think that is, we can't deal with it. Now, employers can make the same argument. There's no question about it. But that's going to the whole philosophical argument about whether there should even be an ADA. That's another question entirely. Employers can say the same thing. Why should I have to hire somebody who can't do the job? Yes, sir. But I thought that's where the ministerial exemption came in. We don't ask those questions. Well, it's a secular inquiry. I mean, you can ask of the Jesuits, why in the world should there be sexual harassment? Why didn't you take corrective measures? You can ask of the Methodist Church, why in the world should there not be reasonable accommodations? Why didn't you do something? What is the relief you're seeking? The relief is monetary damages for the emotional distress. For failing to accommodate while he was there. Yes, sir. And for the physical harm that caused him. The stress did cause him physical harm as well. That's what we're seeking. We're not seeking back wages, front wages, anything relating to termination. No, sir. Not at all. I can't get it. But there's no reason for even asking. In the Ninth Circuit, at least there's a chance that Bollard applies to this situation. It doesn't – nobody else in the country is going to say boo about this case. You have about five minutes. Do you want to save it for rebuttal? Sure. I'd like to do that. Thank you, Mr. Bollard. I appreciate your argument. Yes, sir. Ms. Lewis. May it please the Court. Gordon Lewis of Jennings Strassen Salmon, here on behalf of the Desert Southwest Annual Conference of the United Methodist Church and Vista de la Montaña United Methodist Church. Now, the Church is asking the Court to affirm the judgment of the United Methodist Church  and uphold the First Amendment's protection of a church's ability to select its ministers and establish the conditions of the ministry. And the chief issue the Court has asked to resolve today is whether the Court's ruling in Bollard should be extended to employment decisions regarding church ministers. But the Bollard case itself gives the answer to this question. In Bollard, this Court stated, Indeed, the ministerial relationship lies so close to the heart of the church that it would offend the free exercise clause simply to require the church to articulate a religious justification for its personnel decisions. Bollard then quotes from the Coons case and stated, We cannot conceive how the federal judiciary could determine whether an employment decision concerning a minister was based on legitimate or illegitimate grounds without inserting ourselves into a realm where the Constitution forbids us to tread the internal management of the church. So Bollard makes clear that if the claim at issue involves a church's personnel decision relating to its minister, the Court cannot investigate without violating the United States Constitution. Bollard states that the Court cannot tread on the internal management of the church without violating the First Amendment. And Bollard goes so far as to state that even requiring the church to articulate a religious justification for its personnel decisions would violate the Constitution. Well, here the appellant, by claiming that the church failed to reasonably accommodate his disability, is necessarily stating that the church failed to change the duties he used to perform as a minister for the church. The reasonable accommodation allegation by this minister cannot be viewed as something other than an attack on the church's employment decision of how he, as a minister, should perform his duties. The United States Supreme Court has stated, and this Court states in Bollard, that a court determination that a church's employment decision regarding its minister is illegal or improper would violate the free exercise clause. Your opponent says this has nothing to do with the employment decision. He's not seeking reinstatement. He's not seeking damages for wrongful termination. He's simply seeking damages for the failure to accommodate his disability. What's your response to that? Well, in order to gain that relief, there has to be determination that the church failed to reasonably accommodate his disability under the America's Disabilities  Act, and at every step in that analysis, the court's going to be delving into the internal management of the church. I mean, at the outset, in order to be entitled to relief under the America's Disabilities Act, you have to be a qualified individual with a disability. I understand that it's more difficult, perhaps analytically, when it's something like ADD, but what changed the nature of the disability? What if he were wheelchair-bound? Even if he were wheelchair-bound, regardless of the type of disability that is being alleged, the analysis still returns to, is he a qualified individual with a disability? In order to be that, he has to perform the essential to be able to perform the essential function of the job with or without reasonable accommodation, and essential function of the job. Just assume that the claimant is a paraplegic. Okay. It's a dynamite preacher, knows the gospel backwards, forwards, inside, out. Parishioners love him. But the problem is that the particular church doesn't have ramps for so he can drive his wheelchair up and perform his ministerial duties. You'd have to say the same thing. If the church – it is the church's decision, it is the church's purview on whether or not a minister should continue to continue in their church. It is the – the minister, as Ballard states, is the lifeblood of the church. And by the issue of whether or not that minister should continue is a matter of ecclesiastical decision-making in which the court cannot interfere. We're assuming a case where the person is – this person that's a paraplegic in the wheelchair has simply quit, not pursuing constructive discharge, just saying during the period of time I was there, when the church admits I performed my ministerial duties in an exemplary fashion, they refuse to accommodate my disability, that is, I'm wheelchair-bound, and I want damages under the law for that. Why isn't that Ballard? Because what the – that – what that minister is necessarily stating is they, for a reason – for a reasonable accommodation question, they didn't change the conditions of my job in order to allow me to continue. In order to have an obligation to reasonably accommodate a disability, it either has to be a conscious request on the part of the employee or a conscious recognition on the part of the employer that an accommodation is required. So it is a decision on the part of the church not to make that change. And the inquiry becomes, why did the church make that decision? That moves us into a realm that Ballard forbids, asking the church to articulate the justification for the decision it made on why we would not allow this minister – why we wouldn't make this change to allow this minister to continue. That is effectively and truly a decision on whether this minister should continue in the ministry. You know, Ballard is a little messier than it purports to be, it seems to me. Suppose – Ballard even says at one point, the Jesuits don't claim that being harassed sexually is any part of their church, of their rules, or of their beliefs, okay? It says that. Hasn't it already stepped over the line when it says that? Suppose the Jesuits did say, look, we know that there are some problems developed in the church and there are lawsuits because priests are said to have harassed parishioners. So, our rules are going to be that if you want to be a priest, since we understand people have to release tensions, you've got to be willing to be personally harassed. And you've got to be willing to harass, perhaps, when you feel the need to do it. Suppose they had that as part of their rules. What would Ballard say about that? Well, I think the key distinction in Ballard, and what the court found in Ballard, is that Ballard did not involve any type of personnel decision. What the court in Ballard stated was that we're not going to effectively alter the law because the minister is the victim of the harassment as well as the perpetrator. That they don't feel in Ballard that they are extending further from the principles of the Free Exercise Clause any further than they are for negligent supervision cases by lay personnel. And critically in Ballard, what was alleged was that the Jesuits were enthusiastically encouraging Ballard to continue in his ministry. And those facts could not be further from the facts in this case. There's no allegation that there was an enthusiastic endorsement of the appellant's continuation in the ministry. The opposite is true. You know, the allegation is that the church failed to change the conditions of his employment and terminated the plaintiff and did so with conscious disregard for his rights and did so despite the fact that they make adjustments to others with either similar or worse conditions, both of paragraph 17 and paragraph 18 of Plaintiff's Complaint. The allegation is that the church has consciously opted me out of the ministry. The church has consciously sought to remove me from the ministry. And in order to assess the reasonable accommodation claim that's being made here, this Court is going to have to determine whether that action was legitimate, whether the employment action was legitimate. And Ballard states- So you think Ballard would have come out differently if the church had said, We encourage you to stay, but you must be willing to accept sexual harassment because that's part of being a Jesuit priest? Would the result of that case have been any different, do you think? Well, I think that Ballard is much more akin to a negligent supervision claim or a tort claim than it is for an employment discrimination claim. Under Ballard, if, you know, as opposed to being a minister, you know, he was an adolescent, you know, it is very likely that a claim against the church still would be made under the same types of facts, and the Court would not have the concern of intruding into the internal management of the church. Well, let's take another example. I mean, take the wheelchair example. Let's say you have a minister hired and the governing body says, We're just not going to pay for a lift anymore. So you've either just got to get up here on your own or we can't have you as a minister. And there's a completely secular reason. We can't afford it, so you've got to make your own. It's an identifiable secular reason for changing the conditions of employment. Why would the ministerial exception apply in that case? Well, firstly, I don't think that the secular court can go and say, well, what's your reason for this? No, I understand your point on that, but I'm taking the case where everybody agrees that there is no religious reason. We're not even asking them to come forward. They're just flat out saying, no, we're not going to accommodate you anymore. And there's no religious basis for it. We're just simply choosing not to accommodate you for budgetary or other reasons. Why, under the theory of the ministerial exception, would the ministerial exception apply? Because in this case, there's no really ecclesiastical basis for it. Well, it is nonetheless a question of whether a minister is going to be allowed to continue in his ministry. I mean, we are going to reduce a minister's salary, and it's for purely budgetary reasons. It is nonetheless a question of internal church management, internal church governance relating to the minister who is the lifeblood of the church. That is not a circumstance where the secular court can say, you know, it is inappropriate for you as the church to make the decision regarding your ministers that you're on how you're going to pay them. No, I understand. I guess I'm taking it a step further, which is they're simply saying, no, you're going to get the same pay. You're going to get the same benefits. We're not changing anything, but we're not going to – we've got some stairs there, and we know you can't get up, and we helped you before. We're not going to help you anymore. You know, if that is effectively saying we are selecting you out of the ministry because you can't work as a minister under the conditions that we have in our employment, that is completely within the purview of the church. Economics has something to do with being a church, in a way. Well, you know – Those churches have to allocate their money one way or another. They allocate it to putting in special lists for ministers, or else they – or they allocate it to something else. Is that the point? Well, as it relates to ministers, you know, the church, you know, has the freedom to determine, you know, whether they should be selected, whether they should be deselected, under what conditions that minister – under what conditions that minister should perform, and even requiring the church to say, well, you know, what is your justification for effectively terminating this minister, you know, would offend the free exercise clause of the Constitution. And, again, none of those cases are this case. Right. You know, here, there is no – there's no contention that the church wanted the minister to continue. There's no – there's no contention that, you know, this is something other than a request by an employee to change the conditions of his job to allow him to continue. And, again, he was – he was actively terminated. So, I mean, when the contention is made that, you know, the church disavows, you know, the discrimination at issue in this case, that's not true. The opposite is true. I mean, the church approved and encouraged the circumstances that are alleged in the plaintiff's complaint. You know, the church consciously made the decision to engage in the acts that are the basis for the – for the appellant's complaint. You know, and, again, it would offend the free exercise clause to require the church to articulate a religious justification for what is unquestionably, in this case, by definition, under reasonable accommodation under ADA, a personnel decision. So all the church is asking the court to do is to follow the Bollard decision. Under Bollard, the court will not interfere with the church's ability to choose its ministers. Under Bollard, the court will not interfere with the church's ability to practice its beliefs. And practicing its beliefs encompasses the circumstances under which its ministers, the lifeblood of the church to the people, practice and work. So allowing this claim to proceed would – I will sum it up quickly. Allowing this claim to proceed would offend those principles. You know, the district court properly dismissed this complaint, and we hope that the court will uphold the district court's decision. Thank you for your time and opportunity. Thank you for your argument. Rebuttal? Yes, Your Honor. I want to thank my colleague for his typical eloquence. I hope eloquence doesn't carry the day. He started out by talking about religious justification, and there would be some delving into religious justification and ecclesiastical decision-making. Not at all. There is no religious justification for what has happened here. Right out of the Book of Discipline, there's a section here that deals with acknowledges that accommodations should be made for disabled people, that disabled people should be treated fairly and justly. If it said the contrary, then you'd be out of court? I might be. I might be, absolutely. Well, I don't know about might. You would consider that your case would be over if it said the contrary? Oh, yeah. Oh, I'm sorry. If it said the contrary, absolutely, I'd be out the door. So in other words, what courts have to do is review the church's documents, rules, regulations and such and say, ah-ha, let's see if there's anything in there that goes one way or the other. And that sounds a lot like doing what they keep telling us we are not supposed to do. It sounds an awful lot like that. However, Bollard said the Jesuits would never buy this sort of thing. This is not part of Jesuit doctrine. Bollard is a tricky case. I mean, it's trickier than it looks on its face. But when you cut to the chase on this and you say, well, I don't really complain about their employment decisions. I just want damages. So I don't complain about their not doing X. I just want damages because they didn't do it. That seems slightly disingenuous in the American system because our system sort of boils emotional harm and religious harm and physical harm and everything down into dollars at the end of the day, right? Well, that's part of the system. That's what we have to do, right? And it's an old system after all. So you're beating them up just as realistically if you get yourself a great big judgment against them as if they were forced to accommodate you, right? What's the difference? I'm not worrying about being a minister there anymore. I don't need to be accommodated. I just want big damages if I'm not. Well, I don't think I'm going to get big damages on a case like this. All right. Our system of justice has to deal in damages, and that's what Ballard dealt with. We can't talk about the hiring. We can't talk about the firing. But what comes in between, the church has to abide by laws of general application, health and safety codes, for instance. You can't build a church that's a fire trap. You have to abide by health and safety codes. Well, see, that's a terrific reason to get rid of the ministerial exemption, which you might find some people willing to go along with you on that. That's a good reason for getting rid of the exemption entirely. I mean, why shouldn't churches follow the same rules that every other employer has to follow? What's the argument in favor of that? But that's not what the ministerial exemption says. That's not what the ministerial exemption said before Ballard. After Ballard and the Ninth Circuit, it says something different. It says for hiring and firing and decisions that are related to hiring and firing, the ministerial exception is still strong. But for what happens in the middle, you can't allow a church to treat its ministers different than it treats its lay employees or anybody else. Laws of general application that don't hit the religion of the church are what do apply, which gets us back to the First Amendment, which we haven't really talked about a whole lot. I mean, there's the free exercise clause. We're not ñ there's no contention here, I hope, by anybody that the free exercise clause is involved. I mean, this does not affect the church's ability to practice religion in any way. What we're dealing with ñ I'm sure it does, doesn't it? No, sir. If you take $100,000, say, out of the Roman Catholic Church's budget, you don't think that affects how it performs its religious mission? No. I think that's a surcharge for failing to follow laws of general application that anybody else in the country would follow. But it certainly affects their religious mission. Not directly, Your Honor. I mean, of course, you're robbing Peter to pay Paul, and I know that, that Paul's happy about it. But the difficulty with Ballard is that it says damages, and they're permissible. Right. But in this case, aren't you confined in your damages rather severely? Oh. Because essentially you can't claim any damages from the constructive discharge. Absolutely. It's not a big case, but it's ñ I mean, you've got a few months of failing to accommodate. Yes. And you can't ñ you're in emotional distress and all of that. The other problems attendant with the constructive discharge aren't cognizable, right? That's right. It's not a big case. But it's an important case because churches ñ you've got the church here saying, well, gee whiz, you know, we're a church, ministerial exception. We can do anything we want as far as working conditions, employment conditions for the ministers. Now, but Ballard says, no, you can't create an environment at work that is hostile to the employee. There's no sexual harassment. Well, as far as sexual harassment, for instance, which is a condition there, laws of general application concerning sexual harassment apply. And we're just saying in this particular case, the same situation ought to apply. Now, am I out of time? Oh. No, I just ñ I think we're now repeating arguments, and you ñ the two of you have done a wonderful job. You really have. And I'm setting this up. It's a difficult case. We appreciate your argument. Thank you for coming in today. And the case just argued will be submitted for decision. Thank you, sir. It was a pleasure. Thank you. Let me ask if counsel on Bodette Cox Com, are you ready? Then come on down. I'm going to ask Richard Morrow for Cox Com. John Jakubczyk and Steve Keist for the plaintiffs. Mr. Keist will be presenting the argument. Okay. Mr. Keist. Good morning, Your Honor. Good morning. Steven Keist appearing for the appellants, David and Evelyn Bodette. May it please the Court. Your Honor, we talk about freedom of speech and that it's what makes America great. We talk about the need to extol its virtues around the world. And we talk about freedom of religion in this country and that we all should have the right to exercise our religious beliefs as we believe fit. And we believe this case is about those issues. Those issues.
judges: Fernandez, Hawkins, Thomas